1                  UNITED STATES DISTRICT COURT

2            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

4   ROSARIO JUAREZ,                .
                                   . Docket
5               Plaintiff,         . No. 08-cv-0417-WVG
                                   .
6                    v.            . November 12, 2014
                                   . 7:30 a.m.
7   AUTOZONE STORES, INC.,         .
                                   .
8               Defendant.         . San Diego, California
    . . . . . . . . . . . . . . . .

9

10          TRANSCRIPT OF JURY TRIAL, VOLUME 7, SESSION 1
              BEFORE THE HONORABLE WILLIAM V. GALLO,
11        UNITED STATES MAGISTRATE JUDGE, AND A JURY

12
                     A-P-P-E-A-R-A-N-C-E-S
13
    For the Plaintiff:      Bohm Law Group
14                          4600 Northgate Boulevard, Suite 210
                            Sacramento, California 95834
15                          By:  LAWRANCE A. BOHM, ESQ.
                            - and -
16                          Simpson and Moore
                            121 Broadway, Sixth Floor
17                          San Diego, California 92101
                            By:  CHUCK E. MOORE, ESQ.
18
    For the Defendant:      Littler Mendelson
19                          501 West Broadway, Suite 900
                            San Diego, California 92101
20                          By:  NANCY PRITIKIN, ESQ.
                                 LILIYA STANIK, ESQ.
21

22  Court Reporter:         Chari L. Possell, RPR, CRR
                            USDC Clerk's Office
23                          333 West Broadway, Suite 420
                            San Diego, California 92101
24                          chari_possell@casd.uscourts.gov

25  Reported by Stenotype, Transcribed by Computer

```
 1          SAN DIEGO, CALIFORNIA; NOVEMBER 12, 2014; 7:30 A.M.

 2                              -o0o-

 3      (The following proceedings were held in open court out of

 4   the presence of the jury:)

 5          THE CLERK:  Calling matter Number 1, 08-cv-417,

 6   Juarez versus AutoZone Stores, Inc.

 7          THE COURT:  Good morning, Counsel.  Please state your

 8   appearances for the record.

 9          MR. BOHM:  Appearing on behalf of plaintiff, attorney

10   Lawrance Bohm, Bohm Law Group.

11          MR. MOORE:  Charles Moore, also on behalf of Rosario

12   Juarez.

13          MS. CIARIMBOLI:  Kelsey Ciarimboli, Mr. Bohm's law

14   clerk.

15          MS. LANGMORE:  Attorney Kate Langmore with Bohm Law

16   Group.

17          MS. PRITIKIN:  Good morning, Your Honor.  Nancy

18   Pritikin and Liliya Stanik appearing for defendant AutoZone,

19   and also Rebecca Baggett is present.

20          THE COURT:  All right.  We have a number of issues to

21   take up.  I presume that counsel have each received the audio

22   voicemail message that we received from juror Mr. O'Brien to

23   Mr. Brown, and I asked Mr. Brown to forward that to you so you

24   could listen to it.

25          MS. PRITIKIN:  Yes, Your Honor.
```

1          THE COURT:  I have some thoughts, but my thought is,

2     one, get an idea of when we think the trial might end

3     realistically.  Maybe -- let's deal with Mr. O'Brien last.

4     Your assessment of how the trial might go might depend on how

5     these rulings go this morning.

6          Let's start with whether Dr. Kalish should testify or not.

7     I have reviewed the memorandum, the points and authorities,

8     provided by both sides, and my ruling is that he should not,

9     and let me explain why.  First, it's true that plaintiff

10    agreed, stipulated, if you will, or at least acquiesced in

11    Judge Bencivengo's ruling that plaintiff may only present

12    garden-variety emotional distress evidence such as humiliation,

13    embarrassment, anger or anxiety, and nothing that would be

14    ongoing or lingering.  That, I think, is not in dispute by

15    either side.  And it's true, in my view, that the plaintiff may

16    have crossed the line -- but slightly -- into these prohibited

17    areas beyond the garden-variety emotional distress.

18         But let me get to the transcript.  The only time that I

19    could find, and the only time that plaintiff -- excuse me --

20    defendant noted is at page 179 of the transcript on November 6,

21    lines 2 and 3, where in response to a question, Ms. Juarez

22    said, "I was upset, frustrated.  I wanted the answers.  I was

23    asking, 'What I did do wrong?  Me getting pregnant?'  It was

24    headaches, got constantly sick, depressed, insomnia."

25         Defendant seems to focus on the word "depressed," that

1    there was some clinical depression going on here.

2         My view, at the time that that testimony came in by

3    Ms. Juarez, was that it was more of a layman's inartful way of

4    saying, "I am sad.  I am upset by this.  I am melancholy."

5    There is no evidence whatsoever that she was receiving medical

6    care.  There is no evidence introduced that the plaintiff was

7    receiving counseling, mental health counseling, therapy, or

8    anything of the sort.  There's nothing like that.

9         This is the only place that I can recall, and of course

10   the only place and time that the defendant has cited, where the

11   word "depressed" was used.

12        But I think we need to back up in this transcript by a few

13   pages and go back to page 176 of the transcript, beginning at

14   line 21 to put that particular answer on page 179 into context.

15   And if you go back to page 176, beginning at line 21, the

16   question there was, by Mr. Bohm, "While you were working at

17   that time, after you had been demoted, was it water under the

18   bridge?  Were you done being upset about the fact that you were

19   demoted?"

20        So, clearly, this is a time where Ms. Juarez -- Mr. Bohm,

21   I'd appreciate if you put the cell phone away, unless you are

22   doing legal research.

23             MR. BOHM:  I was trying to pull up a document.

24             THE COURT:  That's where you have your documents, on

25   your phone?

```
1              MR. BOHM:  I have a witness trying to send me a
2    document to print out for later so we don't get delayed.
3              THE COURT:  I appreciate if you'd have one of your
4    associates handle that so you can pay attention so you can
5    respond, even though I am going your way.
6              MR. BOHM:  Understood, Your Honor.
7              THE COURT:  "After you were demoted, was it water
8    under the bridge?  Were you done being upset about the fact
9    that you were demoted?"  Clearly this is a time when plaintiff
10   was still employed by AutoZone.  She had not been terminated at
11   this point.
12        Her answer is, "No."
13        And then the question is, "Can you explain to the jury,
14   during that time after you were demoted up to the point that
15   you left for the birth of your son, how did you feel about the
16   fact that you had been demoted?"
17        And then she goes -- Ms. Juarez answers that question.
18   She was stressed, a lot of pressure, she didn't need all this,
19   quote, "crap."  "I didn't deserve being demoted."
20        "Were you embarrassed to have to return to another store
21   after having been demoted?"  Again, still employed.  So there's
22   no testimony about ongoing or lingering issues.
23        She says, "I felt like I was being discriminated against.
24   I felt like I was being attacked.  I felt I was doing a good
25   job."  And then there's some money issues.
```

1      "And how did that make you feel?"

2      She goes on to talk about some of the things she was

3  unable to do for her children.

4      "It made me feel really bad because I couldn't provide."

5      "Were you angry about the situation?"

6      Again, in context with the previous couple of pages of Q

7  and A, this was dealing with the time when Ms. Juarez was still

8  employed.  This is now at the bottom of page 178.  And then the

9  question, "And when you get angry -- some people get angry in

10  different ways.  Can you explain to the jury, when you get

11  angry, how does it make you feel?"  Still in the context of

12  what she was experiencing during that period of time.

13      And this is the passage that defendant focuses on:  "I was

14  upset, frustrated.  I wanted the answers.  I was asking, 'What

15  did I do wrong?  Me getting pregnant?'  It was headaches, got

16  constantly sick, depressed, insomnia."

17      This is all in the context of the period of time when she

18  was still employed at AutoZone.  Clearly, we don't have

19  ongoing, lingering testimony about her state of mind or her

20  emotional thoughts and processes.  But the word "depressed" is

21  what defendant focuses on, and I find that that one word, out

22  of that entire two- or three-page dialogue of Q and A's, did

23  not violate the spirit or the intent of Judge Bencivengo's

24  order.  I find that it was expressed more in the terms of, as I

25  indicated before, a layman's use of a word that we sometimes

1   employ in everyday language -- "Oh, I am feeling depressed

2   today" -- with no real clinical diagnosis, just a feeling of

3   malaise, or, "I am upset; I am sad."  And as I said, there was

4   certainly no testimony introduced by the plaintiff about

5   receiving medical care and so forth.

6       Furthermore, at no time during this Q and A -- which,

7   according to the transcript, was several pages long -- was

8   there an objection by the defense that Mr. Bohm and his client

9   were stepping outside the bounds of Judge Bencivengo's ruling.

10   The defense is certainly not shy about objecting when they

11   think there's been a violation of a motion in limine ruling.

12   It's happened time and time again.  And on occasion, the Court

13   has instructed the jury to disregard certain testimony that may

14   have been in violation of the motion in limine or close to it.

15   But there's no objection here, no objection here, and I find

16   that the lack of objection either during the questions and

17   answers, or certainly immediately after the word "depressed"

18   was mentioned, was there an objection to the answer and a

19   request to strike.

20       So I find that the defense has waived any potential

21   objection; but more importantly, I find there was no objection

22   even warranted by those series of questions and answers that

23   would give rise to a violation of this rule.

24       Now the other passage that the defendant cites is

25   November 7, page 51, line 16, through page 52, line 6.

1    Now, if you look at those questions and answers,
2  clearly -- if you go back to line 15, one line before the
3  passage that the defendant cites, the quote is, "Now, can you
4  describe for the jury, from the time that you were terminated
5  until today, how have you been sleeping?"  Here, I think, is
6  where the defense gets -- steps over the line into areas that
7  they had agreed not to go, and that is any ongoing or lingering
8  emotional distress issues.  "From the time that you were
9  terminated until today, how have you been sleeping?"

10    And the answer provided by Ms. Juarez is well beyond
11  sleeping.  She talks about not sleeping, sleeping two to three
12  hours, thinking about not paying the bills, stomachaches,
13  headaches, things of that nature.

14    And then the question was, on the top of page 52, "Do you
15  feel angry?"

16    "I feel very, very upset at AutoZone, yes."

17    "And when you feel upset, how does that affect you
18  physically?"

19    "Oh, I start shaking.  Like right now, I don't know if you
20  guys see me.  But yes, I want to say a lot of stuff, but I
21  can't.  I get a knot in my throat," and so on.

22    "And that's how you feel?"

23    "Yes, very frustrated.  I want people to find out what
24  they do is not right against female --" and then the objection
25  "nonresponsive" is made at that point, and I sustain the

1    objection and instruct the jury to disregard the last sentence

2    of Ms. Juarez's response.

3         Now, again, there was no objection with the question being

4    asked, "From the time you were terminated until now, how do you

5    feel?"  Instead, the defense allowed Ms. Juarez to go on and

6    answer the question.  And then there was an objection, and the

7    jury was instructed to disregard a portion of the last part of

8    the answer.

9         While that may be a violation, a technical violation of

10   the rule not to go into ongoing or lingering issues, I find

11   that it was brief in time.  It was not highlighted.  There was

12   ultimately an objection made to part of the answer, but that

13   was several Q and A's down the road.  And, on balance, I

14   believe that allowing Dr. Kalish to testify at this time would

15   open up a Pandora's box, would get into a whole sideshow of

16   issues that the record, as it presently stands, does not merit

17   or warrant under 403 analysis.  So for that reason, Dr. Kalish

18   will not be permitted to testify.

19             MS. PRITIKIN:  May I be heard, Your Honor?

20             THE COURT:  Briefly.

21             MS. PRITIKIN:  Yes.  The only thing I want to address

22   is Your Honor's suggestion that there was an obligation on the

23   part of the defendant to object when it was plaintiff's motion

24   in limine.  This was not defendant's motion in limine.

25   Plaintiff made a motion in limine to prevent Dr. Kalish from

1  testifying by stipulating that they were not seeking damages or

2  anything beyond garden-variety emotional distress.  They said

3  it twice.  It is in two orders.

4      If the plaintiff chooses to open the door, I have no

5  obligation -- defendant has no obligation to object, as opposed

6  to something that we affirmatively asked for a ruling.  This is

7  plaintiff who asked for the ruling.  Plaintiff opened the door.

8  Plaintiff opened the door knowingly and intentionally, and

9  that's the reason we made our motion.  I don't believe that

10  either -- the law in any way obligates the defendant to object

11  when the plaintiff puts in evidence that the plaintiff sought

12  to exclude.

13      Other than that, Your Honor, we understand your ruling,

14  and I think our papers preserve the record in terms of our

15  position.

16          THE COURT:  I think they do adequately.  And to

17  reiterate, the lack of an objection was simply one of several

18  reasons why I am not permitting Dr. Kalish to testify.  And to

19  reiterate, more importantly, I feel that the door has not been

20  opened by the use of the word, "I am depressed."  It may have

21  been opened by use of the ongoing emotional issues, but neither

22  of those to the extent that it requires a sideshow and a

23  separate trial on her emotional distress claims at this point

24  in the trial.

25          MR. BOHM:  Briefly, Your Honor, there's one thing we

1    could have put in the brief to assist the Court.

2            THE COURT:  Do not undo my ruling.  Do not snatch

3    defeat out of the jaws of victory.  Go ahead.

4            MR. BOHM:  I understand.  I just want to remind the

5    Court that we have no claim for any future emotional distress

6    damages.  Moreover, there's no date with regard to what is

7    ongoing versus not.  So it was my presumption -- perhaps

8    incorrectly to some people's view -- that past emotional

9    distress is all emotional distress up to the time of trial and

10   that future, ongoing type of issues is saying or trying to

11   claim that you are going to still be unhappy once this case is

12   over.

13       So that's the explanation of why, and furtherance that

14   there's no harm to the defendant in that future emotional

15   distress isn't even being sought.

16           THE COURT:  Very good.  Thank you.

17       So we have dealt with Dr. Kalish.  Now, let's deal with

18   the next issue, Monique Sorrell.

19       Ms. Pritikin, your point in calling Ms. Sorrell would

20   simply be to say --

21           MS. PRITIKIN:  Simply to say that she was terminated

22   for falsifying audit reports.

23           THE COURT:  That Fausto was?

24           MS. PRITIKIN:  Ms. Fausto was.  That is correct, Your

25   Honor.

1    THE COURT:  Give me an offer of proof.  I know how I

2    would examine her if she was called, to be laser-like in the

3    questioning.  Give me an offer of proof.

4    MS. PRITIKIN:  The offer of proof would be that she

5    would say she is the person who made the decision to terminate

6    Gloria Fausto's employment; that she did so after reviewing the

7    investigation of Ms. Fausto's falsification of audit reports;

8    that she was terminated because she falsified the audit

9    reports; that she was unaware of her pregnancy at the time she

10   made the decision; and her pregnancy would not have affected

11   her decision.

12   THE COURT:  So we are talking about ten questions at

13   most?

14   MS. PRITIKIN:  At most.  That's it.

15   THE COURT:  Mr. Bohm, before you offer any comments,

16   with respect to Ms. Fausto, we had a sidebar with Mr. Merchant.

17   The Court was pretty clear, I thought -- and the defense cites

18   the passage out of the sidebar exchange that we had -- about a

19   couple of very pointed, very focused questions, and you did not

20   do that, leaving the impression, as the defense argues, that

21   Ms. Fausto was unfairly, wrongfully terminated because she was

22   pregnant.

23   Now, I do think Ms. Pritikin recovered from that pretty

24   well on the fly.  But tell me why Monique Sorrell should not be

25   permitted to testify to really close the loop on this and put a

1    period to it as to what exactly happened with Ms. Fausto.

2         MR. BOHM:  Okay.  So I will just be blunt because if

3    the defendant -- I do not believe in gamesmanship.  If the

4    defendant does this, I don't think they really understand what

5    they are doing because there is a treasure trove of information

6    concerning Gloria Fausto, including e-mails to Ms. Sorrell and

7    Ms. Sorrell's subordinates challenging the merits of her

8    termination, specifying she was terminated unlawfully because

9    she was pregnant; indicating that she was plainly, visibly

10   pregnant, six months or eight months pregnant at the time of

11   her termination; asking Alison Smith, Libby Rabun, to look into

12   this decision; this decision is now the subject of a DFEH

13   charge.

14        If they bring in Ms. Sorrell, which -- fine.  Go ahead if

15   you want to do it.  I think they have this record right where

16   they would want it.  I am telling this to the Court, because,

17   frankly, I would rather get this trial done than I get into the

18   case of Ms. Fausto because that's not my client and it's not

19   necessarily my fight.  But I understand if AutoZone wants to

20   bring it, then just so they know, I have got evidence, actual

21   evidence, that Ms. Fausto was challenging her termination.

22        She also told them she refused to sign the termination

23   corrective action because she did not agree she had falsified

24   an audit.  I am not going to use up my precious time, but I

25   don't have to use too much of it to remind this woman,

1    Ms. Sorrell, of things she probably has forgotten, to the

2    extent the defense thinks they want to call her.

3         Here is me, laying my cards down because I don't want to

4    get my hand slapped any more.  But there's a lot more to this

5    story, including that Ms. Fausto was terminated the day after

6    she was represented by Littler Mendelson -- the very day after

7    she gave testimony in a different discrimination case, she was

8    fired.  And it is a discrimination case that's going to trial

9    across the street right after the New Year.  And I will be

10   trying that case as well, the Sandoval case.

11        And Ms. Sorrell is aware of the fact Ms. Fausto gave

12   testimony in Texas.  And in fact, Ms. Sorrell testified in

13   Texas and said very interesting things.  I don't know if the

14   defense has the transcripts or not.

15        But for me, as the trial lawyer, if they want to call

16   Monique Sorrell, I will withdraw my objection.  But I want to

17   make it clear, I have some kicks that I intend to lay down in

18   opposition to what has been represented to the Court in the

19   defense offer of proof.

20        And I know I am giving up strategic advantage in telling

21   the Court I have all this stuff.  I could have sat quiet and

22   let them have Monique Sorrell and done this.  And I don't think

23   that's okay.  In part, I understand the Court's perception I

24   didn't follow the questions exactly as laid out, and I accept

25   that responsibility.  I thought I had gotten what I needed to

1    get when Mr. Merchant said he played a role.  And I understand.

2        And that's why I am trying to do the right thing and say,

3    "I have this information, and I will use this information," and

4    it won't even take me that long to ring all those bells.  It

5    will take the defense significantly longer to unring all the

6    bells I can ring in less than five minutes.

7            THE COURT:  Ms. Pritikin, if Ms. Sorrell is called as

8    a witness, then she is fair game for cross-examination on this

9    point.

10           MS. PRITIKIN:  Well, Your Honor, a couple of things.

11   First of all, I think this is a great illustration of counsel

12   capitalizing on misconduct.  He directly disobeyed Your Honor's

13   order regarding making a reference to Ms. Fausto's pregnancy or

14   pregnancy discrimination.  The motion in limine was to exclude

15   "me too" evidence so we wouldn't have mini trials regarding the

16   termination of various individuals.

17       I frankly think that it would be inappropriate to allow

18   counsel -- that's why I asked for an instruction to the jury --

19   for counsel to attempt to litigate exactly what Judge

20   Bencivengo and Your Honor told him he could not do, which is

21   trying to create "me too" evidence using Gloria Fausto years

22   later.

23       I appreciate, Your Honor, some cross-examination would be

24   appropriate, but it is not a mini trial.  This is not a -- this

25   is something where we are trying to cure the misconduct of

1    counsel.  And counsel's trying to use his own misconduct to

2    prolong the trial unnecessarily and create a mini trial to do

3    exactly what the motions in limine told him he could not do.

4         So I reiterate my request for the instruction because I

5    think the instruction cures it.  But if it doesn't, we have to

6    be able to tell the jury that there was nothing wrong with the

7    termination, and the termination of Gloria Fausto has nothing

8    to do with this case.

9         They put us in this position by their misconduct, and now

10   they want to prolong the trial and create a mini trial.  It's

11   exactly the reasons we made the motion in limine and exactly

12   the reasons they were granted, and I don't think that's

13   allowed.

14        Additionally, if counsel has documentary evidence that

15   they haven't produced to us that they are now going to use to

16   create this -- again, they are capitalizing on their own

17   misconduct.  It's not fair.  And talk about gamesmanship -- for

18   them to come in at the last minute of trial and say, "We have

19   all this other evidence we are going to use," when the only

20   reason there's any need to talk about Gloria Fausto is because

21   of their own misconduct.

22             THE COURT:  Ms. Pritikin, you throw around the word

23   "misconduct" pretty loosely.  And maybe you believe that in

24   your heart of hearts that Mr. Bohm has engaged in misconduct.

25   I will reserve comment on that.

1    I think what is clear, whether it was intentional or

2  inadvertent, or through a lack of understanding, clear

3  understanding, of the Court's instructions, either Judge

4  Bencivengo's or mine, that Mr. Bohm has stepped over the line

5  in several areas.

6    With respect to Mr. Merchant, clearly he stepped over the

7  line.  I believe now, as I did then, that you recovered and

8  rehabilitated that testimony and the impression that Gloria

9  Fausto was wrongfully terminated by the precision-like

10 questioning.  There was only two or three questions, as I

11 recall, that you asked Mr. Merchant on this issue, and he

12 responded accordingly, that there was -- I think his words were

13 that there was an incident that he reported up the chain of

14 command, and someone else made the decision to terminate.

15    I am going to leave it up to you, Ms. Pritikin, whether or

16 not you want to open the door further, if you want to further

17 open the door into exploring Ms. Fausto's termination.  Whether

18 she was terminated wrongfully, whether she was terminated

19 lawfully, is not the subject of this lawsuit.

20    Mr. Merchant testified as he had.  That's when the issue

21 came up as to Ms. Fausto.  It didn't come up during her

22 testimony.  There was no "me too" testimony coming from

23 Ms. Fausto, as I recall.  It was brought up in questioning of

24 Mr. Merchant.

25    All attorneys have to make strategic decisions during the

1   trial.  Do they gain more than they risk in pursuing certain

2   avenues of testimony or evidence?

3       I will permit you to call Ms. Sorrell, but I think

4   forewarned is forearmed.  You know Mr. Bohm is going to go into

5   this, and I will permit him to do so.

6       With respect to documents he may have that have not been

7   turned over and, quote, "capitalizing on his own misconduct," I

8   don't agree with that sentiment.  If he has documents that have

9   not been disclosed -- certainly documents that are used for

10  impeachment purposes I think are appropriate to be used in this

11  fashion, and I will permit him to use those documents.

12      But if you want to open that door further and go down this

13  road and expose even further what may be an incident that was

14  rightfully or wrongfully decided by AutoZone and how Ms. Fausto

15  was terminated, that is your choice.

16          MS. PRITIKIN:  May I just get clarification, Your

17  Honor?  When you say "open the door further," we are not the

18  ones who opened the door on the issue.

19          THE COURT:  But you are opening it further now.

20  That's what I mean.  As far as I am concerned, the issue has

21  been laid to rest.  I thought you did an effective job in

22  counteracting whatever, quote, "impression" may have been

23  conveyed to the jury that Ms. Fausto was wrongfully terminated

24  because she was pregnant.

25      As I recall your questioning of Mr. Merchant -- I haven't

1    reviewed the transcript, so I don't know if I am accurate or

2    not -- but my recollection is, on redirect, you asked him, "Had

3    Ms. Fausto been pregnant twice before?"

4          "Yes."

5          And she wasn't terminated after either one of those

6    pregnancies, and with respect to the third pregnancy, she was

7    terminated because of an incident, but the decision was made by

8    someone other than Mr. Merchant.  And I thought you effectively

9    mitigated any damage and neutralized any damage, if it was

10   created at all, by that testimony.

11         But I understand your reasoning for wanting to call

12   Ms. Sorrell, to emphasize there was no wrongful termination; it

13   wasn't based on pregnancy or anything of the like.  It was

14   based on, quote, "false audit reports."  But I think by doing

15   so, you certainly allow Mr. Bohm to cross-examine Ms. Sorrell

16   about that decision.  That's what I mean by opening the door

17   further.  I think the door has been effectively closed, but if

18   you want to open it again, I think you do so at your peril.  So

19   Ms. Sorrell may be permitted to testify with those

20   understandings.

21         Now, I just received an e-mail that the parties further

22   agreed that Juan Alvarez will not be testifying.  We don't need

23   to deal with Mr. Alvarez then.

24              MS. PRITIKIN:  That's correct.

25              THE COURT:  Mr. Al Azizi, I have read the defendant's

1    brief as to why they want to call Mr. Al Azizi.  Let me

2    understand the chronology of events here a little better.  As I

3    understand the chronology of events, defendant was terminated

4    from AutoZone -- plaintiff was terminated from AutoZone, and

5    then went on a couple of years of unemployment, where she was

6    not employed except for maybe selling burritos on her own.

7              MR. BOHM:  Correct so far.

8              THE COURT:  And then she obtained a job at Fast

9    Undercar, and because she was not a full-time employee, as I

10   recall her testimony, she was still maintaining some

11   unemployment, but those benefits were about to or beginning to

12   run out.  As I understand the testimony further, she went with

13   no gap in employment from Fast Undercar to Metro.  Am I correct

14   so far?

15             MR. BOHM:  Yes, I believe that's correct.

16             MS. PRITIKIN:  Yes.

17             THE COURT:  And that she was terminated from Fast

18   Undercar because she was seeking employment at Metro, which she

19   admitted, and Metro didn't like the fact that she was looking

20   for employment elsewhere after she just get started to work at

21   Fast Undercar.

22             MR. BOHM:  I think it was Fast Undercar --

23             THE COURT:  Yes.  I think Fast Undercar didn't like

24   that she was looking elsewhere for employment while she was

25   still employed at Fast Undercar, while she had not worked there

1    very long.

2         MS. PRITIKIN:  And she was on the clock while she was

3    doing it.

4         THE COURT:  That is the point I want to address, that

5    she allegedly was on the clock and using a company vehicle when

6    she filled out an application.

7       Now, in defendant's brief that was submitted either

8    today -- I just got it today -- is that they want to use Mr. Al

9    Azizi to talk about employment mitigation, mitigation of

10   damages by employment.  Really what you want to do is call

11   Mr. Azizi to impeach Ms. Juarez's testimony that she was not

12   using a company vehicle and she was not on the clock at the

13   time.  That isn't what you are really arguing here.  What you

14   are arguing more is that you want to use him to mitigate the

15   damages.  And the fact that she went from one job immediately

16   to another -- and I think it was higher paying job, if I recall

17   correctly; is that correct?

18        MR. BOHM:  That's correct.

19        THE COURT:  So she went from a lower paying job at

20   Fast Undercar to a higher paying job at Metro, that actually

21   helps the defense.

22      Whether she was untruthful on the witness stand today

23   about the fact she was in a company car and on the clock at

24   Fast Undercar is a collateral issue.  It is not a material

25   issue in this case that needs to be contradicted or impeached.

1    She admitted that she was fired at Fast Undercar.  She admitted

2    that she went to find employment at Metro while she was still

3    with Fast Undercar.  And any effort to impeach her by calling

4    Mr. Azizi to say, "Well, we fired her because she was using a

5    company car and company time" to me is a collateral issue and

6    under 403 analysis doesn't merit the time in opening up that

7    sort of impeachment.  Mr. Al Azizi may not be called for that

8    purpose.

9         MS. PRITIKIN:  Your Honor, with respect to the

10   Court's question about timing in terms of our time estimate and

11   that kind of thing -- because I know we are getting to eight

12   o'clock -- is I need to talk with my client regarding

13   Ms. Sorrell.  Even if Ms. Sorrell testifies, I expect

14   defendant's case -- defendant will rest probably in the next

15   two hours, if not sooner.  So I don't know whether we can take

16   15 minutes later in the morning to talk about jury instructions

17   and get the case to the jury today.

18        THE COURT:  We should be able to do that, I think.

19     Is there a rebuttal case?

20        MR. BOHM:  A very --

21        THE COURT:  Do you anticipate?

22        MR. BOHM:  Yes, a very brief rebuttal case.  When we

23   say get the case to the jury today, I think people are

24   suggesting we would do closing arguments right away, today?

25        THE COURT:  Sure.

1          MR. BOHM:  That's exciting and different.  I was

2    focused on all of these motions yesterday.

3          THE COURT:  So was I.

4          MR. BOHM:  And I appreciate that one of the great

5    things about being the judge is you don't have to do the

6    closing argument.  But I might need just a smidge of time to

7    get my thoughts together for the closing argument.

8          THE COURT:  I could give you a smidge.

9          MR. BOHM:  A smidge?  Okay.  Hopefully our

10   definitions of "smidge" --

11         THE COURT:  Probably not.

12         MR. BOHM:  Well, I will, as always, do my best.  I

13   have never had to do a closing argument just on the fly, but if

14   I have to --

15         THE COURT:  You seem to be a very capable trial

16   attorney who is a quick thinker on his feet.

17         MR. BOHM:  Guilty as charged.

18         THE COURT:  Whenever I practiced law as a trial

19   attorney, I had my closing argument prepared before I even

20   started the case because I always worked backwards.  Because

21   you need to know what you need to argue.

22         MR. BOHM:  Well, I know some things I intend to, but

23   other things come from court.

24      My rebuttal case, just to put it out there, is going to be

25   encompassed of reading some of the PMK deposition testimony,

1    very little of it, because the PMK deposition is fair game to

2    be used.  It is a statement by a party opponent.  It can be

3    used at any time for any purposes.

4        Depending how the witness go, I might have a little bit

5    beyond that, but not much.  So I expect a brief rebuttal case.

6    And I would never do something like just tick away time because

7    I needed it for my closing argument.

8            THE COURT:  Maybe I can ask Mr. Brown to give the

9    attorneys a time hack on the time they have left.

10            THE CLERK:  Right now, plaintiff is at 16 hours and

11    15 minutes, and defense is 7 hours and 39 minutes.

12            THE COURT:  So that doesn't mean you can use 4 hours

13    in your closing, or 13 in yours, Ms. Pritikin.

14            MS. PRITIKIN:  Thank you, Your Honor.

15            THE COURT:  Here is what I would like to do, then.

16    Let's address Mr. O'Brien.  Given the time estimate -- today is

17    what -- Wednesday?  Today is Wednesday.  Right.  Today is

18    Wednesday.  Let's just assume I am being very generous today

19    and I give you the opportunity to, if we finish today, work

20    with closing instructions and begin tomorrow fresh with

21    argument.  I would think we would be done by Friday.  I would

22    hope we would be done and have a verdict by Friday and

23    Mr. O'Brien's concerns wouldn't be a concern.  I would hope

24    that.

25            MR. BOHM:  I have done trials like this before, and

1  the deliberation period -- especially in federal court because

2  of the unanimous requirement -- I know people think it makes it

3  take longer.  It actually makes it take faster in my opinion

4  because we can't have three people sitting out on each

5  question.  So I expect a verdict either -- if we do closings in

6  the early morning on Thursday, by the end of Thursday, if not

7  early morning on Friday.

8      And then, assuming there's a punitive phase, that too will

9  be amazingly brief.  That takes less than an hour from an

10  argument to verdict on the punitive phase.  So the whole thing

11  could quite easily be done.

12      And if Mr. O'Brien, if he can't get it done in that time,

13  that's why we have --

14          THE COURT:  I have just received Mr. Bohm's papers on

15  the JMOL, which I haven't reviewed yet.  But I am going to do

16  that today.

17          MR. BOHM:  May I say something about that, Your

18  Honor, about our papers?  In the rush to get this done by 7:30

19  this morning, one paragraph did not make it into the brief.  I

20  can tell you what it is.

21      We are arguing that Staci Saucier would be a managing

22  agent as the regional and divisional human resources person.

23  So unfortunately that paragraph concerning Ms. Saucier didn't

24  make it in in time before we hit "file."  So I apologize for

25  that.  We did get it in by 7:30.  But I wanted to make known to

1    the Court, Ms. Saucier, as the divisional human resources

2    person identified as being involved in it, would also be a

3    managing agent.

4         THE COURT:  So I think I need to address Mr. O'Brien

5    individually to kind of give him an idea.  What I don't want is

6    him to be preoccupied with, "Am I going to get out of here in

7    time?  Am I going to lose work?"  That sort of thing.

8         But at the same time, who knows how jury deliberations

9    will go?  I don't know.  I don't know what they are thinking.

10   And if it for some reason spills over into Monday, I don't want

11   Mr. O'Brien making a decision simply to make a decision and be

12   done -- either go with or go against the flow just so he can

13   get out of here.

14        So, comments from counsel before I ask Mr. O'Brien to come

15   in?

16        MS. PRITIKIN:  Your Honor, I think that Mr. O'Brien

17   just needs to be advised that we expect the case to go to the

18   jury either today or early tomorrow; that if there's a problem

19   with deliberations that affects him, he can raise that at that

20   point, and not to give him any expectations one way or the

21   other.  But I think Your Honor, when Your Honor advised the

22   jury about the schedule for post evidence, made it sound like

23   it was going to go for a long period of time, which of course

24   it could.

25        But I think if he knows the case is just about over, that

1    might alleviate his concerns, and if he has a problem Friday

2    afternoon if it's still going on, he can raise it with you,

3    might be the best way.

4              THE COURT:  Or I could do this.  When we bring the

5    jury back in, without singling out Mr. O'Brien, I could say I

6    have now received an updated time estimate of the trial, when

7    we expect to conclude.  I expect what we just talked about and

8    not single him out but let the jury know that if there's any

9    issues with respect to this, if it happens to go longer than

10   Friday, they can bring them up at that time.  How is that?

11   Then we don't make him feel like he is being targeted.

12             MS. PRITIKIN:  That's fine.

13             MR. BOHM:  Yes.  And in my closing argument, I always

14   touch on that, if there's weekend coming close; that nobody

15   should be pressuring somebody to make a decision because the

16   weekend is coming; that justice needs the time that it needs.

17             THE COURT:  All right.  Let me go suit up and put my

18   robe on, and I will be right back out.  And I think we can

19   bring the jury in, and we can get going.

20             MS. PRITIKIN:  Your Honor, can we have -- after

21   Mr. McFall is done, can we have our morning break then so we

22   can make our decision on the next witness after that?

23             THE COURT:  How much longer is Mr. McFall going to

24   be?

25             MS. PRITIKIN:  Probably 45 minutes with me, and

 1    cross, and that would probably be an appropriate stopping time.

 2            THE COURT:  All right.

 3            MS. PRITIKIN:  We have Ms. Sorrell coming over, and I

 4    still need a few minutes to talk to my client.

 5            THE COURT:  All right.

 6        (The following proceedings were held in open court in the

 7    presence of the jury:)

 8            THE COURT:  Please have a seat.  Good morning, ladies

 9    and gentlemen of the jury.  Welcome back.  I see the clock

10    indicates it's about 11:12.  And as I indicated before,

11    sometimes we are taking up matters outside of the presence --

12            MR. BOHM:  11:12?  I think it's 8:00.

13            THE COURT:  Did I say 11:12?  How time flies.  8:12.

14        And as I said, sometimes we are taking up matters outside

15    of the presence of the jury in the hopes we can make the trial

16    more efficient for you, even though we asked you to be here 12

17    minutes ago to get started.

18        And I am going to give you an update as to the trial

19    length.  We anticipate that the testimony may conclude today,

20    and we may even begin with closing arguments today or first

21    thing tomorrow morning.  And then, of course, your

22    deliberations will begin immediately after closing argument.

23    That should give some of you a better idea, if you have work

24    issues or family issues or other issues that you are dealing

25    with, as to how to plan.

1        If your jury deliberations are not concluded by Friday and

2   there are issues that some of you may have with respect to

3   employment or otherwise, you can bring them up to the Court at

4   that time, and we will address them.  All right?

5        But we are about ready to get started for the morning.

6        Let the record reflect that the jury is present.  Counsel

7   and clients are also present.  And I believe Mr. McFall is

8   still on the witness stand.

9        Mr. McFall, if you could resume your rightful place on the

10  witness stand, we will get started.  And Mr. McFall, let me

11  remind you, you are still under oath in this trial.

12              THE WITNESS:  Yes.

13                    KENT McFALL,

14        DEFENDANT'S WITNESS, PREVIOUSLY SWORN

15              DIRECT EXAMINATION (CONTINUED)

16  BY MS. PRITIKIN:

17  Q    Good morning, Mr. McFall.

18  A    Good morning.

19  Q    When we broke on Monday, we were talking about the fix-it

20  list, and I wanted to direct your attention to -- let me be

21  sure I have the right one -- Plaintiff's Exhibit 87.  I am

22  going to put the binder in front of you.  It's not that one.

23       So you have in front of you Exhibit 87?

24  A    Yes.

25  Q    You recognize this document?

1    A      Yes, I do.

2    Q      And is this another fix-it list that you gave to

3    Ms. Juarez regarding her store?

4    A      Yes, it is.

5    Q      And so a lot has been said in this courtroom about the

6    fact that it was three pages.  What is the reason it was three

7    pages?

8    A      At that time, I had mentioned in the past, the store had

9    gotten better, and at this moment, I wanted to make sure I got

10   her attention towards the issues that need to be fixed in the

11   store.  It might be big, but at the same time, it's more how

12   big I write so it will be understandable, but yet at the same

13   time, it's just more detailed.  That's what it is.

14   Q      And how much time did Ms. Juarez and her store have to

15   address the issues on this list?

16   A      She has about -- she had about two to three weeks to take

17   care of this.

18   Q      And the total number of hours it would take to get every

19   single thing on the list done perfectly, even if you had to do

20   it, kind of, the hard way, how long, about, would it take?

21   A      I am looking at it -- like I said, some of these are like

22   15-, 10-minute jobs, things that just need to be handled.  Most

23   of them, probably if I was to put an average on it, probably

24   spend about seven to ten hours a week.  So in the three weeks'

25   time, 27 to 30 hours at the most.

```
 1   Q    And these were things that could be done when?  How would

 2   you fit those in, in running a store?  Can you explain that to

 3   the jury?

 4   A    Yes.  It can be worked in between customers, if you are

 5   not busy.  Make sure the AutoZoners are efficient, and go out

 6   there, and take care of this matter.  When -- as I mentioned,

 7   some of this is daily recovery, cleanups.  At the same time,

 8   part of this, too, looking at it, that there is an inventory

 9   matrix that you get five hours a week to take care of that.

10   Q    Let me stop you there.  When you say you get five hours a

11   week to do the inventory matrix, what does that mean?

12   A    An extra five hours is given to the stores to take care of

13   that, above the customer service hours we get.

14   Q    Just to be clear, when you talk about "getting hours,"

15   what that means is the store has budgeted hours for an employee

16   to work for that period of time; is that right?

17              MR. BOHM:  Leading.

18              THE WITNESS:  Yes.

19              THE COURT:  Overruled.

20              THE WITNESS:  Yes.  We do get hours for customer

21   service time.

22   BY MS. PRITIKIN:

23   Q    For the matrix, there were five additional hours per week?

24   A    Yes, that's given to the store.

25   Q    And when you talked about the weekly matrix, Number 4 on
```

1    your list, was that something that takes the five hours that

2    are allotted?

3    A     Yes, it does.

4    Q     And there's been some testimony -- Number 11 is create and

5    build ashtray.  Can you explain to the jury, first of all, why

6    you put that on the list, and second of all, how long it would

7    take to do that?

8    A     Create and build an ashtray -- we have those plastic trash

9    bins that we put outside for customers to put their oil

10   bottles, any kind of trash they want to get rid of.

11        All we have to do is grab one of those antifreeze drip

12   pans that we sell in the store, put it on top of that and pour

13   soda ash or kitty litter for oil absorbent.  And that probably

14   will take you no more than 20 to 30 minutes at the most to take

15   care of that task.

16   Q     Was any part of this fix-it list put together as some kind

17   of punishment of Ms. Juarez?

18   A     Not at all.

19   Q     Was there anything on this fix-it list that didn't need to

20   be done in the store?

21   A     No.  This is usually your common maintenance and how to

22   maintain your store, to make it look presentable and clean.

23   Q     How is it that you put the list together?

24   A     Usually, I go to the store.  I walk the store.  As -- most

25   of the time, I take care this first thing.  When I walk in, I

1    greet all the AutoZoners.  I talk to the AutoZoners.  I walk

2    the store, the front and the back of the store.  As I walk, I

3    create my "do" list.  I write my own little notes and

4    transcribe them to this form before I leave for the day.  Or

5    before I leave for the day, I will walk my manager with it, and

6    let them know what exactly I saw.

7    Q    Did you do that just for the Plaza Boulevard store or all

8    the stores in your district?

9    A    I do this to all my stores in my district, up to now.

10   Q    Was Ms. Juarez's pregnancy, at any part of this fix-it

11   list -- is that the reason for it?

12   A    No, not at all.

13   Q    What about her gender as a woman?  Is that the reason you

14   gave her the fix-it list?

15   A    Not at all.

16   Q    And now, if you look in the binder at Exhibit 65,

17   Plaintiff's Exhibit 65, that I believe is in evidence, do you

18   recognize that document?

19   A    Yes, I do.

20   Q    And what is this?  Explain that to the jury.

21   A    It's my Performance Improvement Plan.  What it is is any

22   kind of actions that you want any AutoZoner or manager to

23   improve on, you have this document so that you could present it

24   to them.

25   Q    And what was the reason that you put together a

1  Performance Improvement Plan for Rosario Juarez?

2  A    I wanted to make sure that I got her attention towards the

3  seriousness of those matters that I had been addressing in the

4  past and make sure that she gets that fixed and, like I said,

5  improve on them, so that we can get the store running the way

6  it should be and, of course, her as well, successful at what

7  she does.

8  Q    Is Exhibit 65 the first document you gave to Ms. Juarez as

9  part of the Performance Improvement Plan process, or was there

10 something else?

11 A    No.  This is the first one in which it's just the subjects

12 or the issues that I wanted to get addressed.

13 Q    And what was the idea after she got this?  You would do --

14 when would you do follow-up?

15 A    Actually, most of the time, my follow-up is weeks.  Every

16 week, I would follow up on the fix-it plan or Performance

17 Improvement Plan, and make sure to inspect anything that is

18 improving or anything that has not improved yet.

19 Q    Do you recall the date on which you gave Ms. Juarez

20 Exhibit 65?

21 A    On this one right here, the date shows 12 -- if it's the

22 15th, meaning I did it a week before this.

23 Q    So a week before December 15?

24 A    Yes.

25 Q    And how was it that you physically gave the list, this

1   Performance Improvement Plan, to Ms. Juarez?

2   A    I visited Ms. Juarez's store at Plaza Boulevard, and

3   through the course of the day, I walked the store, did what I

4   do the first part of that, and then we went to lunch.  And at

5   lunch is when I presented her with the Performance Improvement

6   Plan, so it would be away from the store, and we could address

7   the subjects and matters that needed to be addressed.  And

8   that's how I presented this to her.

9   Q    And did Ms. Juarez say -- what did she say, if anything,

10  in response?

11  A    Nothing that I remember, that she gave me pushback on it

12  or anything like that.  Nothing like that.

13  Q    After you had lunch and gave her the Performance

14  Improvement Plan, what happened next?

15  A    We came back to the store.  And when we came back to the

16  store, actually that's where we -- when we went to the back

17  room of the store, we saw Alejandra.

18  Q    Alejandra Perez?

19  A    That's correct.

20  Q    What happened next?

21  A    When we came back to the store, that's when Alejandra told

22  me that Rosa was pregnant at that time.

23  Q    What did you say?

24  A    I congratulated Ms. Juarez and told her if she needed

25  anything from me, let me know.

1 Q     Were you angry at Ms. Juarez for being pregnant?

2 A     No.

3 Q     Did you tell her you felt sorry for her?

4 A     Not at all.  I was actually happy for her.  It's the same

5 feeling I had when I had my two kids.

6 Q     And did you treat Ms. Juarez any differently as a result

7 of learning she was pregnant than you had been treating her

8 before?

9 A     No.

10 Q     Did you tell Ms. Juarez she should step down?

11 A     No.  We never had a conversation.

12 Q     Did you tell her that in her condition you didn't think

13 she could do the job?

14 A     No, I didn't.

15 Q     Did you think that because she was pregnant that maybe she

16 was going to have difficulty meeting the requirements of the

17 Performance Improvement Plan?

18 A     No, I didn't.

19 Q     Did you think she had the capability of meeting the three

20 requirements of the Performance Improvement Plan at the time

21 you learned she was pregnant?

22 A     Yes, she did.

23 Q     And did you continue to believe that each week when you

24 met with her?

25 A     Yes, I did.

```
 1   Q    And if you take a look at Exhibit 67 that I believe is in

 2   evidence -- do you recognize that document?

 3   A    Yes, I do.

 4   Q    Can you tell the jury what this is?

 5   A    This is the Performance Improvement Plan on my first

 6   follow-up with Ms. Juarez.

 7   Q    And the signatures are dated 12/19/2005.  Are those

 8   accurate?

 9   A    That is correct.

10   Q    Can you -- at the bottom, it says "12/19/2005" in

11   handwriting.  Is that your handwriting?

12   A    Yes, on the "Comments" side.

13   Q    Are the initials both yours and Ms. Juarez's?

14   A    That is correct.

15   Q    And can you tell us what this says, the first part that's

16   handwritten on the right-hand corner, in "Comments"?

17   A    Yes.  Planograms -- or POGS, as we abbreviate them -- got

18   caught up already.  Just need final and finishing touches on

19   several areas.  Example, i.e., labels for stickers, scan-outs

20   on tools.  Finish the top planner Planogram.

21        Second one to that is daily recovery still has to get

22   implemented to crew and fast.

23        Last one is quantity on hand, or QOH, and outs, still an

24   issue in store and overstock.

25   Q    When you say, "Daily recovery implemented to crew and
```

1    fast," can you explain what that is?

2    A    Recovery is our way of front-facing, bringing the products

3    up front so the products -- so the customer gets accessibility

4    and presentation.  What that does for us is that every day,

5    that's a daily routine for all the stores.  That means we

6    always have a checklist every day we print out.  And part of

7    that nightly checklist is the store -- or the AutoZoner to go

8    out to the store, recover, front-face the stores, and have it

9    presentable for the next day.

10   Q    And it has -- where it says "Achieved," there's a question

11   mark, and there's -- what letter is that?

12   A    An N.

13   Q    What does N mean?

14   A    It was not achieved, no.

15   Q    And did Ms. Juarez argue with you and say it had been

16   achieved or anything like that?

17   A    No, she didn't.

18   Q    And then if you take a look at Exhibit 73 -- I am sorry.

19   I need to have you go back.  Sorry.

20        Exhibit 64.  Can you tell the jury what this Performance

21   Improvement Plan is?

22   A    This was my follow-up on January 4 of '06, at that time

23   already.

24   Q    And then there are initials.  Those are your initials and

25   Ms. Juarez's initials?

```
1   A    That is correct, yes.
2   Q    And then it says -- under "Achieved," can you tell us what
3   those say?
4   A    First one is N, meaning no.  The second one is P,
5   partially.  And then the third one is an N again.  It is a no.
6   Q    Can you tell us what it says in the comments?
7        That is your handwriting, right?
8   A    Yes, that is correct.
9        Inventory matrix being done with -- with consistency.
10  Truck being put up and overstock being pulled daily.  And the
11  second one, overstock still needs to be accurate.  And the
12  third one is recovery still an issue and area merchandiser
13  needs to be implemented.
14  Q    Did you and Ms. Juarez -- did Ms. Juarez disagree with the
15  assessment of where she was with meeting the goals on the
16  Performance Improvement Plan?
17  A    No, she didn't.  She initialed and signed it as well.
18  Q    Did Ms. Juarez ever say to you, "I can't do this because I
19  am pregnant," or anything like that?
20  A    No, not at all.
21  Q    If you take a look at Exhibit 73 that's in evidence, tell
22  us what that is.
23  A    This is the -- the way -- it looks like my final review of
24  the Performance Improvement Plan that was done on 1/13 of '06.
25  Q    What does it say in the comments section for this one?
```

1    A    On the comments section, first one is overstock is still

2    not where it needs to be.  And area merchandiser program not

3    implemented to company guidelines.

4    Q    And it doesn't look like there are initials in the bottom

5    part.  Do you know why that was?

6    A    That one, right there, I made a witness initial on the

7    outside of that and just had Ms. Juarez sign it.

8    Q    You didn't have her initial the other sections, just had

9    her sign the plan?

10   A    Yes.

11   Q    Did she disagree with any of the assessments that you made

12   about whether or not she had met the requirements of the

13   Performance Improvement Plan?

14   A    No, she didn't.

15   Q    Did you believe that she had met the requirements of the

16   Performance Improvement Plan as of January 13, 2006?

17   A    No, she didn't.

18   Q    After you issued this Performance Improvement Plan, did

19   you -- did you continue to be Ms. Juarez's district manager?

20   A    Not anymore at that time.

21   Q    That's when you were transferred?

22   A    Yes.  I was given a different market.

23   Q    And did you have any interaction or any dealings with

24   Ms. Juarez after you had this meeting on the final meeting on

25   the Performance Improvement Plan?

1    A      Not anymore at that time.

2    Q      The person who initialed, who was a witness to this

3    meeting, what initials are those?

4    A      That's Mr. Marc Torres.  At that time, he was a regional

5    training manager.

6    Q      And did you have any input into the decision on whether or

7    not Ms. Juarez should be demoted?

8    A      No.  I did not.

9    Q      Did you think that Ms. Juarez wasn't trying to meet the

10   requirements of the things you were pointing out to her in the

11   store?

12   A      No, not at all.

13   Q      What did you think was the problem that she had in her

14   role as store manager?

15   A      As my observation and being her supervisor, I saw she

16   struggled giving good, clear direction towards her management

17   staff and holding them accountable towards their role in all of

18   that.  And as well, I think the big struggle is just

19   accountability towards the staff as well, not just management

20   but the staff as well towards getting most of the daily

21   routines accomplished.  That's where the struggle was.

22   Q      Mr. McFall, there was some exhibits I need to go over with

23   you, so if you could take a look at Exhibit 95 in the binder

24   that's in front of you.  I think this has been called in the

25   courtroom a goal post report.  Would you agree with that?

1   A    Yes, it is.

2   Q    What is a goal post report?

3   A    A goal post report is our report that shows how the store

4   is doing compared to last year's sales or business.  What it

5   does, it kind of gives you a little bit of a measurement and

6   how are you comparing in comparison to last year's business on

7   the current year.

8   Q    Was this Ms. Juarez's store during the time she was store

9   manager?  Is this goal post report about that store, Plaza

10  Boulevard?

11  A    Yes.  5659, Plaza Boulevard.

12  Q    How would you explain what this goal post report shows?

13  A    At that time, all the way to period five, or actually

14  period six, week two -- close to the midyear, middle part of

15  the year -- the store was running negative, pretty much, two

16  percent to that time.

17  Q    Meaning that sales were two percent lower than the year

18  before?

19  A    In comparison to last year, that is correct.

20  Q    And if you lake a look in your binder -- take a look at

21  Exhibit 314.  Do you recognize this document?

22  A    Yes, I do.

23  Q    What is it?

24  A    It's our profit and loss statement for the store.

25  Q    Is this something that, as the district manager, you would

```
 1    look at for the stores that you supervised?

 2    A    Yes, I do.  Not just the store, even on my own, that this

 3    is the store's report card.

 4              MS. PRITIKIN:  Your Honor, we would offer

 5    Exhibit 314.

 6              MR. BOHM:  I have no objection.

 7              THE COURT:  314 may be admitted.

 8        (Defendant's Exhibit 314 received into evidence.)

 9    BY MS. PRITIKIN:

10    Q    And so if you take a look at Exhibit 314, what store is

11    this a profit and loss summary for?

12    A    This is for 5659, Plaza Boulevard store.

13    Q    And what does this tell us about how the store was doing

14    economically, separate and apart from how it looked or whether

15    the overstock was being done?

16    A    Up to that -- for that period itself, for that month

17    itself, the store was negative, 11 percent or 11.9 percent for

18    the sales.  Year to date, they are 8 percent down in sales

19    compared to last year.

20    Q    Now --

21              THE COURT:  I am sorry.  Can you show me where you

22    are getting that information from off this first page?

23              THE WITNESS:  If you look at that total sales right

24    here, Judge, in that line.

25              THE COURT:  All right.
```

```
 1              THE WITNESS:  From there, if you go all the way to
 2   the right, there's one that says percent.  YAG.  It's
 3   11 percent.  11.9 percent down.
 4              MR. BOHM:  Your Honor, may I approach to see what
 5   Bates page he is referring to?
 6              THE COURT:  Sure.  Sure.
 7              MR. BOHM:  Let the record reflect he is referring to
 8   Bates page 314-001.
 9       And do you see that right there?  That helps us know where
10   you are at.
11              THE WITNESS:  Okay.  I am sorry.
12              THE COURT:  I got that because he was showing me.  I
13   don't know if the jurors -- do you want to question him,
14   Ms. Pritikin?
15              JUROR:  It's too small to read on the screen.
16   BY MS. PRITIKIN:
17   Q    I don't know if making it bigger is going to help.
18        Tell us the name of the column again.
19   A    It's the 314-001, and it is from the column from the
20   left-hand side, like the first group of numbers, where you see
21   the line underneath it.
22   Q    I see.
23   A    And it will give you that 98,319.  Right next to it is
24   100 percent.  And if go to the right now, see underneath -- I
25   can't see the screen.  The screen period five.
```

```
 1              MS. PRITIKIN:  We will make it bigger.
 2              THE WITNESS:  That's the year-to-date number.
 3              JUROR:  We will see it later.
 4   BY MS. PRITIKIN:
 5   Q    The jury will see it in the jury room.  You can take that
 6   down.
 7        Was Ms. Juarez written up for sales, for problems with
 8   sales and profitability?
 9   A    No.  She has never been.
10   Q    And did you have any thoughts, when you were issuing the
11   corrective action and the Performance Improvement Plan for
12   Ms. Juarez, whether the steps you were recommending would help
13   sales or hurt sales?
14   A    Actually, that was to improve sales.  That's why I was
15   wanting those to get improved.
16              MS. PRITIKIN:  If I could have a moment, Your Honor.
17              THE COURT:  Yes.
18   BY MS. PRITIKIN:
19   Q    If you go back to the first binder -- sorry to switch back
20   and forth.  And I think we may have talked about this briefly
21   on Monday, but just in case, I want to be sure we covered this
22   in the record.
23        If you go to Exhibit 24, can you explain to us why
24   Ms. Juarez's store manager bonus worksheet makes it look like
25   her store was in the positive when her store sales were in the
```

1   negative?

2   A     This is our target worksheet.  This is for store managers

3   to try for their bonus.  What we do with this is we get a set

4   target for us as a district, and as a district, we can divide

5   that target amongst our stores.  Depending on the struggle of

6   the store last year or something that could cause externally,

7   we could adjust those targets, meaning give them less targets

8   compared to last year's sales.  And that's to help managers get

9   their bonus.

10          MS. PRITIKIN:  One moment, Your Honor.

11      No further questions, Your Honor.

12          THE COURT:  Mr. Bohm, cross-examination?

13          MR. BOHM:  Thank you, Your Honor.

14                      CROSS-EXAMINATION

15  BY MR. BOHM:

16  Q     Hello, sir.

17  A     How is it going?

18  Q     Thank you for being here.

19      Okay.  Exhibit 314, just confirm for the jury, that is the

20  profit/loss -- it was in the other binder, but keep that one

21  open.  We are going to come right back.  I didn't expect to

22  start here, but while it is all open, we will take care of

23  business.

24      So 314 was the profit/loss sales reports for the Plaza

25  store, is your testimony.  Correct?

```
1    A    That is correct.
2    Q    Now, that report goes through what period of time, sir?
3    What is the last reported business period in that report?
4    A    This is period five of that fiscal year.
5    Q    Period five of fiscal year 2006, correct?
6    A    2005.
7    Q    I am sorry.  What does it go through?  That's where it
8    starts.  It's starting in fiscal year 2005.  What is the last
9    period that's reported in that collection of documents?
10   A    Goes all the way to period four of fiscal year 2006.
11   Q    Are you able to recall the AutoZone fiscal year in terms
12   of periods and what that corresponds to?  It's okay if you
13   don't.  We have a period calendar.
14   A    No, I don't really.
15   Q    Let me show you where the period calendar is.  One moment.
16   Let me be sure I have the right binder.  You don't have the
17   official witness stand binder.  That's over here.  Let me give
18   that to you, sir.  Lift up that binder for a moment.  There we
19   go.
20        Do you recognize that period calendar there?
21   A    Yes, I do.
22   Q    That's AutoZone's period calendar?
23   A    That is correct.
24            MR. BOHM:  Your Honor, I would like to have
25   Exhibit 218, the period calendar of AutoZone for fiscal year
```

 1   2006, admitted into evidence.

 2          THE COURT:  I thought it was 221.

 3          MR. BOHM:  Did I have the number wrong?  I am sorry.

 4   I was doing too many things at once.  One moment.  Let me look

 5   at the tag number.

 6      You are correct, Your Honor.  It's 221.  Thank you.  And I

 7   would offer that into evidence.

 8          THE COURT:  Any objection?

 9          MS. PRITIKIN:  Well, it's not authenticated other

10   than -- I have no objection, Your Honor.

11          THE COURT:  It will be admitted.

12      (Plaintiff's Exhibit 221 received into evidence.)

13   BY MR. BOHM:

14   Q    So utilizing the period calendar, you can indicate -- what

15   is period four?  It begins when?

16   A    November 20.

17   Q    November 20.  So the document which you were just

18   reviewing has all the profit/loss reporting for the store work

19   by Rosario Juarez before you gave her her PIP, correct?  Your

20   PIP was December of 2005 is your testimony here today, correct?

21   A    This is for fiscal year 2006.  So November -- yes.

22   December -- actually, it is within that time frame.

23   Q    You gave the PIP to Rosario Juarez in December is your

24   testimony, correct?  December 2005?

25   A    That is correct.

1    Q    And December 2005 is in period five, correct?  Right?

2    Last week of the period four?

3    A    It is the week ending period four.

4    Q    And the PIP went from period five to period six, correct?

5    A    It went from the tail end of period four to period five

6    only.

7    Q    I thought the PIP was set to expire January 26?  Didn't

8    you -- check Exhibit 74, was your last PIP.

9           MS. PRITIKIN:  Objection, Your Honor.  Misstates the

10   testimony.

11          THE COURT:  Overruled.

12          THE WITNESS:  My last follow-up there was 1/13.

13   BY MR. BOHM:

14   Q    The sales figures which you just testified about,

15   Exhibit 314, it does not include the sales performance of

16   Ms. Juarez through the time her PIP was complete, correct?

17         You are missing profit/loss statements for the weeks

18   that -- some of the weeks that Ms. Juarez was on PIP, correct?

19   A    If this is only to period four, that finished in period

20   five -- yes, that's missing that one period.

21   Q    Looking at Exhibit 24 for a moment, let's be clear.

22   Exhibit 24.  That's the bonus worksheet that has the sales

23   targets, correct?

24   A    That is correct.

25   Q    And Ms. Juarez works them through period four, week one,

1    through period six, week two -- do you see that there?

2    A    Yes, I do.

3    Q    So you do not have the sales data for any part of period

4    five or any part of period six in Exhibit 314, correct?

5    A    That is correct.

6    Q    Now, you would agree that the form that is the sales bonus

7    worksheet, that's printed up based on information from

8    AutoZone, correct?

9    A    Yes.

10   Q    AutoZone sets those sales targets, correct?

11   A    Yes.

12   Q    And is it a good thing to hit your sales targets?

13   A    It is a good thing to hit the sales target because that

14   makes managers get a bonus.

15   Q    You put Ms. Juarez on a Performance Improvement Plan while

16   she was hitting her store targets every week except for one

17   week; is that true?

18   A    No.  I put her on a PIP because those can help, what I am

19   giving her as an improvement, help her drive that sales higher.

20   Q    Your PIP started after period four began, correct?

21   A    The PIP started within period four.

22   Q    The last week of period four, correct?

23   A    The third week of period four.

24   Q    The first week of period four, she was above her target,

25   correct?

```
 1    A    Yes.

 2    Q    In the second week of period four, she was above her

 3    target, correct?

 4    A    Yes.

 5    Q    And the third week of period four, when you decided to

 6    give her a PIP, she was still above her sales targets, correct?

 7    A    Yes.

 8    Q    And every week thereafter, except for one, until the time

 9    that you were no longer a district manager, she was hitting her

10    sales targets week after week, correct?

11    A    Yes.  She was hitting her sales targets.

12    Q    Even though she missed it one week, you also track it

13    target to date, where you add up each week so you can see the

14    total sales in a period and then accumulate them?

15    A    We track target to date, and sales to last year as well.

16    Q    So even though she missed one sales target by a couple of

17    hundred dollars, she was above the quarterly-to-date sales

18    target the entire time from period four through the time she

19    was asked to leave the store, correct?

20    A    She was hitting her target.  But as mentioned, comparative

21    sales is important as well, because that gauges you from last

22    year.

23    Q    You put her on this Performance Improvement Plan and --

24    withdrawn.

25         You have indicated today that you had no input on the
```

1    demotion.  That's your testimony here, correct?

2    A    That's true.

3    Q    You knew that the demotion -- withdrawn.

4         You knew that the Performance Improvement Plan was going

5    to be utilized by somebody, correct?

6    A    If they choose to, yes.

7    Q    In fact, it was utilized by a woman named Staci Saucier.

8    Do you know who that is?

9    A    She was my human resource at that time.

10   Q    In fact, you handed over the PIP to Ms. Saucier for

11   further handling, correct?

12   A    That's true.

13            MS. PRITIKIN:  May we have a sidebar, Your Honor?

14        (The following proceedings were heard at sidebar:)

15            MR. BOHM:  I am assuming you have some objection, you

16   want me to say what I am about to do, because I am happy to say

17   to Your Honor, this is the summary judgment declaration against

18   Staci Saucier.  It is a statement by a party opponent.  In

19   paragraph 14, it talks about how they reviewed the PIP, and in

20   paragraph 15, and how the PIP was used as a basis for the

21   demotion.

22            MS. PRITIKIN:  This declaration has nothing to do

23   with this witness.  It doesn't say that she reviewed it with

24   him.

25            MR. BOHM:  It doesn't say that, but he said he had no

1    input into the demotion, and this is -- whether he knows about

2    it or not, this is refuting that testimony, that in fact he did

3    have input because they relied on the PIP which he performed.

4                THE COURT:  He just admitted it.

5                MS. PRITIKIN:  He said he gave her the PIP.

6                THE COURT:  He gave her the PIP.

7                MR. BOHM:  But this further establishes the PIP was

8    utilized as a basis for the termination of Ms. Juarez --

9    demotion.

10               MS. PRITIKIN:  He can't testify --

11               THE COURT:  Hang on.  He just admitted that he

12   forwarded the PIP to Ms. Saucier.  Maybe it is a matter of

13   semantics as to whether he had input directly, talking to

14   Ms. Saucier.  You can ask him these types of questions.  We are

15   not going to introduce this or question him about this because

16   it doesn't refute what he just said.

17               MR. BOHM:  Understood.  When this comes up later,

18   this will be a part of our rebuttal case, where we will request

19   permission to read the statement of a party opponent concerning

20   the issues which are in dispute after the Defendant's case in

21   chief.

22               THE COURT:  We will take that up at that time, see if

23   it's appropriate to do so.

24               MR. BOHM:  Thank you, Your Honor.

25            (The following proceedings were held in open court in the

1    presence of the jury:)

2    BY MR. BOHM:

3    Q    Sir, when you gave the PIP documentation paperwork to

4    Ms. Saucier, it was so she could follow through with whatever

5    needed to be done, correct?

6            MS. PRITIKIN:  Objection, Your Honor.  Calls for

7    speculation.

8            THE COURT:  Overruled.

9            THE WITNESS:  Ask the question again.

10   BY MR. BOHM:

11   Q    The reason why you gave it to Ms. Saucier was because you

12   believed you needed to give the PIP to Ms. Saucier so she could

13   follow through with whatever was going to happen as a result of

14   it, correct?

15   A    I was going to turn it in to her anyway.  Those are

16   usually the protocols, what we do.

17   Q    After you turn it in a PIP, it is considered by human

18   resources, and action may or may not be taken, correct?

19           MS. PRITIKIN:  Objection.  Calls for speculation.

20   Foundation.

21           THE COURT:  Overruled.

22           THE WITNESS:  That's up to them to make the decision

23   what they are going to do next.  I am no longer the district

24   manager for that store.

25

```
 1   BY MR. BOHM:
 2   Q    You eventually learned Ms. Juarez was demoted?
 3   A    Yes, I did.
 4   Q    How did you learn that?
 5   A    I just heard it through them, anybody, some people.
 6   Q    And what did you hear was the reason for her demotion?
 7   A    That I don't know.  I just heard that she was already
 8   demoted.
 9   Q    And you don't know -- as the district manager for
10   AutoZone, you do not know why Ms. Juarez was demoted, correct?
11   A    Not the details of it and what they decided on what
12   transpired afterwards, no.
13   Q    You do not know who made the decision to demote
14   Ms. Juarez?
15   A    No.
16   Q    You said that you became a district manager in May of
17   2005, approximately?
18   A    I was given the position, yes.  May.
19   Q    And you were promoted by Dan Merchant, true?
20   A    True.
21   Q    You think very highly of Mr. Merchant?
22   A    Yes, I do.
23   Q    You find Mr. Merchant to be somebody to be looked up to?
24   A    Definitely.
25   Q    Did you know his nickname was Mr. AutoZone?
```

1    A    No, I didn't.

2    Q    Mr. Merchant, to your observation, has always been

3    extremely loyal to AutoZone, correct?

4    A    As far as I observed, yes.

5    Q    And you, too?  You are also extremely loyal to AutoZone,

6    correct?

7    A    I am.

8    Q    Every day, you do that AutoZone -- that AutoZone cheer and

9    chant, correct?

10   A    Every day?  No.

11   Q    Aren't you supposed to do it every day?

12   A    No.

13   Q    You also do a pledge --

14   A    That is correct.

15   Q    -- to AutoZone?

16        Now, you are worried if this case turns out poorly for

17   some reason, it could affect your employment, correct?

18   A    No.

19   Q    When you said that you became a district manager in May.

20   Just to put it in a timeline, do you recall that there was a

21   district manager gathering in Ontario the year that you became

22   a district manager, the month after you became a district

23   manager?  Do you remember that?

24   A    No.

25   Q    Sometimes the district managers go to Ontario for

```
1   training?

2   A     I've been to Ontario for training, yes.

3              THE COURT:  What was the time frame, again, on that?

4              MR. BOHM:  I will be specific.  I thought I said

5   2005.  That's right.  2005.  Let me see if I can refresh the

6   recollection of the witness.  I am sorry.

7   BY MR. BOHM:

8   Q     I will show you a document, and you may look at it for

9   yourself to see if it refreshes your recollection.  Take a

10  moment.  Look at it.  Consider it.  All right.

11       Do you recall that in 2005, there was a DM development

12  training session in Ontario, California?

13  A     No.

14  Q     I will show you another document to refresh your

15  recollection.  Please take a moment, looking at the agenda to

16  yourself.

17             MS. PRITIKIN:  Your Honor, may we approach?

18             THE COURT:  Well, not yet.

19  BY MR. BOHM:

20  Q     Take a look at the document for yourself.  Take a moment.

21  And when you have completed reviewing it, I would like to ask

22  you a question.  You have had a chance to look at everything?

23  A     Yes.

24  Q     Does that refresh your recollection as to a training for

25  district managers going on sometime around June of 2005 when
```

1    you were promoted to the district manager position?

2    A    No.  I was not involved in this one right here.

3    Q    You believe, even though you were promoted to district

4    manager in 2005, that you were excluded from the district

5    manager training?

6             MS. PRITIKIN:  Objection, Your Honor.  Argumentative.

7    And foundation.

8             THE COURT:  Sustained.

9    BY MR. BOHM:

10   Q    Now, at AutoZone, they have various different kinds of

11   documents and procedures that need to be posted in the store;

12   is that true?

13   A    Yes.

14   Q    And you would always follow company policy with regard to

15   the items to be posted in the store, true?

16   A    We would try.

17   Q    One of the things that was supposed to be posted in a

18   store is a document known as a legal module.  Do you remember

19   that?

20   A    I am not really familiar with the legal module, what

21   document that is.

22   Q    Take a look at this document and read it to yourself.

23        Have you had a chance to review that?

24   A    Yes, I have.

25   Q    Does that document remind you of a document that would

```
 1    have been hung inside the stores of AutoZone?
 2    A     No.
 3    Q     Now, you have heard of something called the
 4    problem-solving procedures, correct?
 5    A     Yes.  Yes, I have.
 6    Q     Is it true that the normal flow of problem-solving
 7    procedures should be that the store manager -- the order would
 8    be store manager; district manager; regional human resource
 9    manager; divisional human resource manager; and five, AutoZoner
10    Relations.  Is that your understanding?
11    A     That's what it shows there, yes.
12              MS. PRITIKIN:  Objection, Your Honor.  May we
13    approach?
14              THE COURT:  Is that your understanding based on your
15    own knowledge or what you have read in that document?
16              THE WITNESS:  Oh, to my own knowledge as well.
17              THE COURT:  All right.
18    BY MR. BOHM:
19    Q     Let's stick to what is in your own knowledge.  Okay, sir?
20    A     Right.
21    Q     Also, as a district manager, you have access to e-mail,
22    correct?
23    A     Yes.
24    Q     And you send e-mails back and forth to the company about
25    store operations, those kinds of issues, correct?
```

```
1   A    At that time, in 2005, we didn't have those e-mail

2   available yet, but now we do.

3   Q    You have heard of Zap Mail, correct?

4   A    Those are Zap Mail for the store, yes.

5   Q    Are you saying that Zap Mail didn't exist?

6   A    It did exist, but Zap Mail is only inter-store.

7   Q    Is it your testimony today that as a district manager, you

8   had no ability to e-mail your superiors?

9   A    No, not until we use our own personal e-mail.

10  Q    So you are saying at that time, if you wanted to e-mail

11  Mr. Merchant, you would just use your personal e-mail account?

12  A    Yes.

13  Q    And you would e-mail, correct?

14  A    Yes, I would.

15  Q    And in fact, the company would send out lots of different

16  reports by e-mail; is that true?

17  A    Yes, they do.

18  Q    And I guess they would send those to your personal e-mail

19  account?

20  A    Some of them, yes.

21  Q    Now, they also encourage district managers and store

22  managers to keep a day-timer, correct?

23  A    Yes, we do.

24  Q    The day-timer -- you receive very specific instruction in

25  terms of how to fill out your day-timer, correct?
```

```
 1   A    Not specific, but to how we can understand it ourselves,
 2   when we are logging our own stuff.
 3   Q    One of the things that you are trained on is that, when
 4   you are logging information in your day-timer, that you should
 5   remember that your day-timer could be discoverable in the event
 6   of a lawsuit, true?
 7            MS. PRITIKIN:  Objection, Your Honor.  May we
 8   approach?
 9        (The following proceedings were heard at sidebar:)
10            MS. PRITIKIN:  I don't know that I should keep trying
11   to prevent misconduct from occurring because perhaps a mistrial
12   is the only way to resolve it.  But in the interest of trying
13   to get this trial done and to the jury, these documents were
14   expressly excluded by Judge Bencivengo.  They weren't produced
15   in the litigation.  They have shown it to the witness to
16   suggest he's destroyed something when there is no evidence he
17   wrote a single e-mail regarding Ms. Juarez or anyone else, and
18   they are trying to back-door information that they can't get in
19   otherwise.
20        So whether he kept his day-timer or not, whether he kept
21   his e-mails or not, what the company's retention policy is,
22   these are things that have nothing to do with this witness, and
23   they are just trying to get it in front of the jury to get in
24   evidence that's already been excluded.
25            MR. BOHM:  First of all, as to the allegation about
```

 1   misconduct, I checked Judge Bencivengo's ruling.  She indicated

 2   certain documents could not be used as exhibits.  We talked

 3   about pretrial that it would be permitted to use certain

 4   documents to refresh recollection.  Further, Judge Bencivengo

 5   was very specific about AutoZone's own policies and procedures

 6   which it has, which she said may end up being fair game because

 7   it is their own policies and procedures.  And I have that

 8   highlighted at counsel table.

 9        But yeah, I haven't used it, haven't published it.  I am

10   just using it to refresh recollection, which is something we

11   talked about at the very beginning of the case.

12        THE COURT:  So far, I haven't heard any testimony or

13   hinted in questioning that he is suggesting Mr. McFall has

14   destroyed evidence.

15        MS. PRITIKIN:  He is about to ask him whether he's

16   been told to destroy e-mail and destroy his day-timer.  That is

17   where he is going.  It's obvious.  That's why he put the

18   document in front of him.  There's no evidence at all this

19   witness destroyed a single document regarding Ms. Juarez, no

20   evidence at all.

21        THE COURT:  I assume he would say, "No, I didn't

22   destroy anything."

23        MS. PRITIKIN:  I don't think he should be allowed to

24   ask that question and create the question that documents have

25   been destroyed.

1    THE COURT:  Is that where you are going?

2    MR. BOHM:  That's not where I am going.

3    THE COURT:  Are you going to ask him if he destroyed

4 evidence?

5    MR. BOHM:  I am not asking if he destroyed evidence.

6    THE COURT:  What are you going to ask him?

7    MR. BOHM:  I am going to ask him the kind of

8 documents that he ordinarily keeps to record what is going on

9 at the store.

10    THE COURT:  If he says, "I keep a day-timer" --

11    MR. BOHM:  That's perfect.  I know in the day-timer

12 they are supposed to keep track of when meetings occur, when

13 PIPs happen, when they give fix-it lists, store visits, all the

14 kind of information that a plaintiff's lawyer, like myself,

15 would definitely want.  But it was not produced.

16    I don't have to get the second part.  I need the jury to

17 know these kinds of documents exist, and it comes to the

18 defense as to why you don't bring any of these documents to

19 court.  But that's all I am establishing is what kinds of

20 documents exist.

21    MS. PRITIKIN:  The day-timer of this witness was

22 never requested in document production.

23    THE COURT:  So here is what we will do.  Skip over

24 this.  I imagine you have other areas you can inquire on that

25 are going to take us to our break at about 9:20 or so?

```
 1              MR. BOHM:  Of course.

 2              THE COURT:  At 9:20, we will continue this in further

 3    detail.

 4        You can talk to your client about Ms. Sorrell.

 5        I will give them an extra long break, 20 minutes, and give

 6    you each an opportunity to convince me it should stay out or

 7    you should be able to do it.

 8              MR. BOHM:  I am not even trying to get this document

 9    in.

10              THE COURT:  I understand that.  But you are picking

11    around the edges of it.  And if it's into an improper area all

12    together, where there's no good-faith basis to even suggest

13    that there's been any records kept and/or maintained and/or

14    destroyed, we probably shouldn't be getting into it.

15        You are going to have an opportunity at the break.  Let's

16    move on.

17              MR. BOHM:  In my rebuttal case, I am going to bring a

18    witness that says this was hanging up in the store.

19              THE COURT:  Let's move on.

20         (The following proceedings were held in open court in the

21    presence of the jury:)

22    BY MR. BOHM:

23    Q    All right, sir.  One of the issues that was discussed in

24    this case was the fix-it list, right?  Do you remember that?

25    A    Yes.
```

1    Q    And at the bottom of the fix-it list -- it's 86 and 87 in

2    that binder before you.  But at the very bottom of the fix-it

3    list, there's some boxes to check.  They are sort of -- you

4    will see them at the very bottom, the boxes that indicate where

5    the document should go.  Do you see that there?

6         Pick either form as long as you can read the bottom.  Do

7    you see it at the bottom?

8    A    Yes.

9    Q    Tell the jury what is supposed to happen.  According to

10   the boxes at the bottom of the form, what happens to the form?

11   A    Attach white copy to office bulletin board, yellow copies

12   to DM, and DM to place in store visit binder behind store tabs.

13   Q    The first one again?  I didn't quite catch the first one.

14   A    Attach white copy to office bulletin board.

15   Q    Then there's a store binder, correct?

16   A    Store visit binder.  That's our binder.

17   Q    Meaning the DM's binder?

18   A    Yes.

19   Q    And do you keep your store visit binder in the store?

20   A    No.  Those are our binders that we travel with.

21   Q    So you have heard of a trunk file?

22   A    Yes, I have.

23   Q    And was it part of your trunk file, the store binder?

24   A    A store file, yes.

25   Q    And in particular, the binder that has the fix-it list --

```
 1    call it a store binder -- that would be in your trunk file?

 2    A    Yes.

 3    Q    So you would keep, of course, because it was required by

 4    the form, all fix-it lists that you gave to the store, true?

 5    A    Yes.

 6    Q    So do you have any understanding of why there's only two

 7    fix-it lists that you prepared that are in this case?

 8              MS. PRITIKIN:  Objection, Your Honor.  The witness

 9    doesn't know what plaintiff asked for in discovery or what the

10    discovery is.  That's not a proper question to ask him why.

11              THE COURT:  Sustained.

12    BY MR. BOHM:

13    Q    Sir, where are all the other fix-it lists?  You have

14    covered two.  Where are the rest of your fix-it lists for that

15    store for that time?

16    A    I am not the one presenting the fix-it list in this court,

17    and basically, on those, some of them may be gone already.

18    Q    My question just is -- you say some of them may be gone

19    already.  Do you know that those fix-it lists are gone?

20    A    I don't know where they are at anymore.

21    Q    When you say you don't know where they are at, do you

22    think you threw them out?

23    A    We get them sent to the distribution center for

24    destruction.

25    Q    You are saying your fix-it lists from that time get sent
```

1   to a distribution center for destruction?  What does that mean?

2   A   Not at that time.  I usually keep two years' worth.  After

3   two years, I send them out so they could get destructed

4   properly.

5   Q   You think that you sent all the other fix-it lists out for

6   Ms. Juarez out to be destroyed?

7   A   Yes.

8   Q   And you did that according to company policy?

9   A   That's the way we handle our -- it gets discarded.

10  Q   You were aware that Ms. Juarez filed a complaint with the

11  Department of Fair Employment and Housing, true?

12  A   I found out years later.

13  Q   You found out only years later that Ms. Juarez went to the

14  Department of Fair Employment and Housing?  That's your

15  testimony?

16  A   As far as I know, as I remember.

17  Q   So then I guess you don't remember submitting an affidavit

18  in support of AutoZone in July of 2006 in opposition to

19  Ms. Juarez's charge of discrimination?

20  A   I can't recall that.

21  Q   Take a moment, sir, and review that document for yourself.

22  A   Okay.

23  Q   Now, you see at the bottom, talking about July 2006?

24  A   Yes.

25  Q   That's your signature there, correct?

1   A     That is correct.

2   Q     Does this refresh your recollection that AutoZoner

3   Relations had you prepare an affidavit to submit in opposition

4   to the DFEH claim of Ms. Juarez?

5          MS. PRITIKIN:  Objection to the form of the question,

6   Your Honor.  How it was prepared and why it was prepared may be

7   attorney-client privilege communications.  And it's not in

8   handwriting.  It's typed up.

9          THE COURT:  Sustained.  Why don't you rephrase your

10  question.

11  BY MR. BOHM:

12  Q     Sure.

13        Sir, does this refresh your recollection that you knew

14  about Ms. Juarez having a DFEH charge related to pregnancy and

15  her gender?

16  A     It's there, yes.

17  Q     And you knew that July 2006?

18  A     That's the date that's in here, sir, yes.

19  Q     And you knew that it was being investigated by the legal

20  department, also known as AutoZoner Relations, correct?

21  A     That's correct.

22  Q     And so you had all these fix-it lists in your car at that

23  time, true?

24  A     I could have purged it already.  As of this time, I was no

25  longer the district manager for the stores.

1   Q    Even though just a moment ago, you said you wouldn't purge
2   it for two years, now, when you see your affidavit, you are
3   saying you may have already purged it by July of 2006?  That's
4   your testimony?
5   A    I could have purged it when I was no longer the district
6   manager, meaning I put it away after I was gone from the
7   district.
8   Q    Sir, do you remember purging your documents right after
9   you stopped being -- or are you saying you might have, now?
10  A    I purged my documents regularly, every quarter.
11  Q    So earlier, when you said that you save your documents for
12  two years, that was just a mistake on your part?
13  A    No.  Purging, meaning me taking out from my binder and
14  putting it away and filing it is two different things, versus
15  me sending it out for destruction.
16  Q    You indicated in this case that it was Ms. Perez,
17  Alejandra Perez, who told you Ms. Juarez was pregnant, right?
18  A    That is true.
19  Q    But in your affidavit, you indicated that it was
20  Ms. Juarez.  "Ms. Juarez notified me of her pregnancy."  Do you
21  see that there, in paragraph 4 of your affidavit?
22  A    This says Ms. Juarez, yes.
23  Q    So which version of the events is true, Mr. McFall?  Was
24  it Ms. Perez or Ms. Juarez?  Or can you even remember?
25  A    She was there, too, as well, when this was announced to

```
 1   me.
 2   Q    Earlier, you told the jury specifically it was Ms. Perez
 3   who told you Ms. Juarez was pregnant.  In your affidavit back
 4   in July 2006, you said Ms. Juarez and you didn't say anything
 5   about Ms. Perez, true?
 6   A    Ms. Perez is the one who announced it to me.
 7   Q    You know a man named Omar Cortez, correct?
 8   A    He was one of the parts sales managers in the store.
 9   Q    You had a good relationship with Omar Cortez?
10   A    Professionally.  That's it.
11   Q    What do you mean by that?
12   A    Only at work.
13   Q    Okay.  Why is that?
14   A    Because I don't hang out with my people outside of work.
15   Q    What do you mean by that?
16   A    I don't hang out with any one of them, nor do I socialize
17   with any of them.
18   Q    As to Omar Cortez, you considered him to be a positive
19   member of Ms. Juarez's management team, correct?
20   A    I wouldn't go that far, but --
21   Q    You wouldn't?
22   A    No.
23   Q    And Ms. Perez, you considered her to be a positive member
24   of Ms. Juarez's team, right?
25   A    She was.
```

```
 1   Q    Honest?
 2   A    I don't really know in regards to the honesty part and all
 3   that stuff, no.
 4   Q    How about this?  You never had a reason to doubt the
 5   honesty of Ms. Perez, true?
 6   A    Not until recent.
 7   Q    You never had a reason to doubt the honesty of Mr. Cortez,
 8   true?
 9   A    Not until recent as well.
10   Q    You say not until recently because you heard about the
11   things they testified in this case; is that right?
12   A    I heard some.
13   Q    Now you are saying, because these people came and painted
14   a different picture, they are all liars, but you are the one
15   who tells the truth?
16   A    There's a lot of lies, yes.
17   Q    And until you heard what their testimony was in court, you
18   never regarded Ms. Perez or Mr. Cortez to be dishonest people?
19   A    In the store level?  No.
20   Q    Who did you hear about their testimony from?
21        MS. PRITIKIN:  Objection, Your Honor.  Calls for
22   attorney-client privileged communications.
23        THE COURT:  Overruled.
24   BY MR. BOHM:
25   Q    You may answer.
```

```
1    A    Just when I read a, I guess, deposition in the past.

2    Q    Mr. Cortez and Ms. Perez were never deposed.

3    A    I have read a deposition for Ms. Perez.  Not Mr. Cortez,

4    but Ms. Perez.

5    Q    A deposition?

6    A    Some kind of forms or documents that was -- I actually

7    even reviewed it.  It was even in my deposition.

8    Q    That was all just recently, true?

9    A    That was in 2009 when I read it.

10   Q    You read it in 2009.  What was going on then?

11   A    That's when I was deposed, in 2009.

12   Q    One of the issues that you wrote up Ms. Juarez for related

13   to a corrective action review for the audit.  Do you remember

14   you covered that with the defense?  I believe it was referred

15   to as Exhibit 320.  It's also in the Plaintiff's exhibits.  But

16   you have that in mind, right, sir?  The audit, corrective

17   action memo for the audit?

18   A    What number is that again?

19   Q    Number 78 in the Plaintiff's binder that you have right in

20   front of you.  You can use that one.

21   A    Yes.  This is a corrective action.

22   Q    This is a corrective action where, allegedly, you are

23   saying to Ms. Juarez that her store failed an audit, right?

24   A    Not alleging.  She failed an audit.

25              THE COURT:  Hang on one second.  I don't have 78 as
```

```
 1    having been admitted into evidence.
 2              MS. PRITIKIN:  No objection, Your Honor.
 3              MR. BOHM:  Then it must have come in as the
 4    Defendant's number, which is fine.  I can use the Defendant's
 5    number as well.  It's 320.
 6              THE COURT:  There's a complementary Defendant's
 7    exhibit that came in?
 8              MR. BOHM:  I believe 320 came in yesterday.
 9              THE COURT:  That's the equivalent?
10              MR. BOHM:  Yes, sir.  And I will just use the defense
11    number.
12              THE COURT:  All right.
13    BY MR. BOHM:
14    Q    All right.  So, first of all, let's explain.  The audit,
15    when you do your audit, you have to keep paperwork to prove
16    what you did, true?
17    A    True.
18    Q    No audit paperwork -- in the world of loss prevention, if
19    you don't have your paperwork, you didn't do your audit, true?
20    A    We do have documentation for audits themselves, and those
21    are in paper form, yes.
22    Q    Just to be make sure we are clear, the loss prevention
23    training on this issue for everybody -- store managers and
24    district managers alike -- if you don't have your actual audit
25    paperwork where you did your audit, as far as AutoZone is
```

1    concerned, you never did an audit.  Is that part true, correct?

2    A    That's correct.

3    Q    For this corrective action review, that is Number 320,

4    there should be a paper audit where you are going through the

5    store and specifying the items which allegedly Ms. Juarez

6    failed to do?

7    A    She -- there was a paper audit.  She was present when that

8    happened, and I did the audit, and I read the audit with her

9    and reviewed it with her, every single one of them, because

10   part of that is correcting the issues that came out of that

11   audit, that failed.  And this corrective action shows that that

12   audit happened, and she was there, and she signed the document.

13   Q    Where is the audit, sir?  Where is the actual piece of

14   paper which you claim shows that Ms. Juarez failed the store?

15   Where is it?

16   A    That I don't have anymore in my possession.

17   Q    Were you able to see it to prepare for any of your

18   deposition or testimony?

19   A    No, I didn't.

20   Q    You can't tell the jury what specific things she even

21   failed on the audit, can you?

22   A    I can't.  But she signed the document, meaning she was

23   there, she saw it, she reviewed it.

24   Q    Then after the audit paperwork, there's backup for the

25   audit itself.  So first you have the corrective action, which

```
 1    we have as Exhibit 320.  Then you have the audit, that you are

 2    basing your corrective action on.  And then, in order to

 3    prepare your audit, you have all the store's paperwork, which

 4    would prove that the items in your audit were legitimate,

 5    correct?

 6    A    Yes.  I did have that documentation.

 7    Q    And that documentation of the store, that's kept in a

 8    period box, true?

 9    A    For her as well, yes.

10    Q    Where is the paperwork?  Where is the actual paperwork

11    that would prove to this jury that what you are saying is true,

12    that Ms. Juarez actually failed that audit?  Where is that

13    paperwork, sir?

14         MS. PRITIKIN:  Objection, Your Honor.  Form of the

15    question.  Argumentative.

16         THE COURT:  Sustained.

17    BY MR. BOHM:

18    Q    Where is the paperwork which would show how and why

19    Ms. Juarez failed that audit?  Not the audit itself, but the

20    backup paperwork, where is that?

21    A    I don't have it.

22    Q    What do you mean you don't have it?  Where did it go?

23    A    Probably got filed -- same as her copy -- got filed in her

24    store.  And I am not sure what happened to that afterwards.

25    Q    Well, no audit paperwork, it's like the audit never
```

```
 1   happened, right, Mr. McFall?
 2   A    It did happen.  She was aware of what she lost the points
 3   on, and she signed the document that said she failed an audit.
 4   Q    If AutoZone came to you and said, "I want you to prove you
 5   did the audit of Ms. Juarez," and you don't have that audit,
 6   you understand the company is not going to consider that you
 7   did the audit just because you remember it, right?
 8           MS. PRITIKIN:  Objection, Your Honor.  Argumentative.
 9   Assumes facts not in evidence.
10           THE COURT:  Overruled.
11   BY MR. BOHM:
12   Q    Right?
13   A    In 2005, I would have had that audit.  I would have had
14   that present.
15   Q    My question was, sir, if AutoZone came to you and said,
16   "Where is the audit," and if you don't have that audit,
17   AutoZone is not going to accept your recollection that you did
18   it.  If you don't have the audit itself, as far as the company
19   is concerned, it never happened, correct?
20   A    Again, if I would have had that document at that time, if
21   it was requested to me to back this corrective action up, I
22   would have given it.  I would have had it.
23           MR. BOHM:  Move to strike as nonresponsive.
24           THE COURT:  Sustained.
25       Ladies and gentlemen of the jury, you are instructed to
```

1    disregard the last response made by Mr. McFall.

2    BY MR. BOHM:

3    Q    Mr. McFall, if they came to you and if you didn't have the

4    audit, you know -- as an AutoZone district manager, you know

5    the rule.  If you don't have the audit to show you did it, then

6    the company is not going to accept your word that the audit was

7    done, correct?

8          MS. PRITIKIN:  Objection.  Misstates the witness's

9    testimony there's any rule.

10          THE COURT:  Overruled.

11    BY MR. BOHM:

12    Q    Correct?

13    A    That's true, yes.

14          THE COURT:  Would this be a convenient place to take

15    our recess?

16          MR. BOHM:  Yes, Your Honor.

17          THE COURT:  Ladies and gentlemen of the jury, we are

18    going to take our morning recess.  It's going to be a little

19    longer than we have taken in the past, from 10 minutes to 20

20    minutes.  It is now 20 minutes after the hour.  Please return

21    at 20 minutes until ten o'clock, so 9:40 we will return.  You

22    are instructed to remember the admonitions, please.  Don't

23    discuss the evidence with anyone or do any independent

24    investigation on your own.  See you in 20 minutes.

25          (The following proceedings were held in open court out of

```
 1    the presence of the jury:)

 2            THE COURT:  Mr. McFall, you are also excused at this

 3    time, 20 minutes.  Please do not discuss your testimony with

 4    anyone other than counsel.

 5        (Witness left the courtroom.)

 6            THE COURT:  Let the record reflect that the jury has

 7    departed, and Mr. McFall has departed the courtroom.  Counsel

 8    and clients are again present.  All right.

 9        So with respect to the questioning of Mr. McFall about his

10    day-timer and the policy and procedures of AutoZone to maintain

11    an accurate, ongoing account and log of the daily activity and

12    to make entries, Mr. Bohm, can you give me an offer of proof of

13    where you intend to go and how you intend to get there?

14            MR. BOHM:  Actually, Your Honor, what you just saw

15    with regard to the audit paperwork, and the -- sorry; my brain

16    just got a little muddy -- but the various paperwork issues

17    that I just covered -- the fix-it list.  That was the other

18    one.  There's just a treasure trove of documents that could

19    have been available for this trial that have not been

20    presented.

21            THE COURT:  All right.  So Ms. Pritikin indicated at

22    sidebar there was not a request for certain documents and

23    therefore not an obligation to disclose certain documents.  And

24    if that is true, then it would make this kind of questioning

25    somewhat unfair, "gotcha" kind of questioning; is that right?
```

```
 1              MS. PRITIKIN:  That's correct, Your Honor.  There was
 2    no request for day-timers.  There was no request for e-mails,
 3    e-mails by this witness.  There's no evidence this witness had
 4    e-mails that haven't been turned over.
 5         So while there were some general requests made in
 6    discovery and objections were made, there's no request that
 7    asks for a day-timer and asks for e-mails by this witness
 8    regarding the plaintiff.
 9              THE COURT:  Okay.  So Mr. Bohm, here is what I would
10    like for you to do is if you have a discovery request that
11    covers this area and a response that you have received or have
12    not received, and both counsel can provide that to me, I will
13    address the issue.
14              MR. BOHM:  Just as an example, Number 22, any and all
15    documents --
16              MS. PRITIKIN:  Which set?
17              MR. BOHM:  RFP, set one.
18              THE COURT:  When was that submitted?
19              MR. BOHM:  July 29, 2008.  While Ms. Juarez was still
20    employed.
21         And I am giving counsel a moment to catch up.  She asked
22    for it.
23              MS. PRITIKIN:  Request for production?
24              MR. BOHM:  Yes, ma'am.
25              MS. PRITIKIN:  Let me find set one.  Excuse me.
```

1         THE COURT:  Do you have it there, Ms. Pritikin?

2         MS. PRITIKIN:  It is correct that there was a request

3  for an e-mail between Kent McFall and Deborah Gooden -- very

4  narrow.  And I don't have a problem with him asking whether he

5  has e-mails between the two of them.  And we objected to it.

6  And they didn't make a motion.  And we objected on the grounds

7  it was vague and ambiguous and undue burden.  And then we said

8  we would supplement if we located any.  And the fact we didn't

9  locate any means there was no evidence there was any e-mail

10  communications.

11        MR. BOHM:  I just said one of the first ones because

12  she said e-mail.  Now I am going through --

13        THE COURT:  Why don't you each take a few minutes

14  during the recess, find those passages in the specific

15  discovery request that you think addressed the issue.

16    And, Ms. Pritikin, the discovery responses that you think

17  also address the issue.  And talk with your client about

18  Ms. Sorrell.  And we will get back here in ten minutes, at

19  9:35, to address this point before bringing the jury back in.

20        MS. PRITIKIN:  Thank you, Your Honor.

21        THE COURT:  Stand in recess until then.

22    (Recess in proceedings at 9:27 a.m.  The transcript

23  resumes in Volume 7, Session 2, page 83.)

24                      -o0o-

25

```
 1                     C-E-R-T-I-F-I-C-A-T-I-O-N


 2


 3            I hereby certify that I am a duly appointed,

 4   qualified and acting official Court Reporter for the United

 5   States District Court; that the foregoing is a true and correct

 6   transcript of the proceedings had in the aforementioned cause;

 7   that said transcript is a true and correct transcription of my

 8   stenographic notes; and that the format used herein complies

 9   with rules and requirements of the United States Judicial

10   Conference.

11            DATED:  November 12, 2014, at San Diego,

12   California.


13


14                       /s/  Chari L. Possell
                         _____
15                       Chari L. Possell
                         CSR No. 9944, RPR, CRR
16


17


18


19


20


21


22


23


24


25
```

## I N D E X

ALPHABETICAL INDEX OF WITNESSES:            PAGE   VOL.

**McFALL, KENT – DEFENDANT'S WITNESS**
    CONTD. DIRECT BY MS. PRITIKIN .............29     7
    CROSS BY MR. BOHM .........................46     7


CHRONOLOGICAL INDEX OF WITNESSES:           PAGE   VOL.

**KENT McFALL – DEFENDANT'S WITNESS**
    CONTD. DIRECT BY MS. PRITIKIN .............29     7
    CROSS BY MR. BOHM .........................46     7


EXHIBITS ADMITTED INTO EVIDENCE:

DEFENDANT'S EXHIBITS:                         PAGE   VOL.

314    ...........................................43     7


EXHIBITS ADMITTED INTO EVIDENCE:

PLAINTIFF'S EXHIBITS:                         PAGE   VOL.

221    ...........................................48     7